Filed 4/30/20

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| CARMEL DEVELOPMENT COMPANY, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> LARRY ANDERSON et al., <br><br> Defendants and Appellants. | H041005 <br> (Monterey County <br> Super. Ct. Nos. M91899, M91649) |

Plaintiff Carmel Development Company, Inc. provided design and construction work for a luxury subdivision (Monterra) in Monterey County over the course of more than 10 years under an oral contract with property owner Roger Mills, the principal of Monterra Ranch Properties, LLC (Monterra LLC). Plaintiff recorded a mechanic's lien and a site improvement lien against certain lots in Monterra after being informed that Monterra LLC would be unable to continue paying for plaintiff's work. Plaintiff sued several of Monterra LLC's investors with property interests in unsold lots in the development (defendants Larry Anderson et al.) as well as Monterra LLC, alleging causes of action for among other things breach of contract and foreclosure of the mechanic's and site improvement liens. Monterra LLC stipulated to liability before trial; the investor defendants contested liability in a lengthy bench trial.

Defendants appeal from the judgment which validated the mechanic's and site improvement liens and attached them in specified amounts to lots owned by defendants for purposes of lien foreclosure. Defendants argue that the trial court erred by determining: (1) that plaintiff could maximize the amount of money owed under the liens

by applying payments received for the liened work to other work it performed at Monterra that was not the subject of the liens; (2) that plaintiff could selectively allocate liability for the liens to certain lots even though the improvements that were the subject of the liens benefited all lots in Monterra; (3) that the lien amounts could include contractual interest; and (4) that plaintiff was entitled to prejudgment interest. Defendants also argue there was no substantial evidence to support the existence of an oral agreement for contractual interest. Plaintiff cross-appealed to preserve its arguments related to contractual interest and the allocation of lien liability.

For the reasons stated here, we will reverse the judgment because it was improper to allocate the water infrastructure lien only to certain benefited lots; the liens could not accrue contractual interest greater than the reasonable value of the improvements; and the trial court applied an incorrect rate to calculate prejudgment interest. We will remand the matter with instructions (detailed in Part II.F.) to remove contractual interest from both liens, reapportion the water infrastructure lien, and recalculate prejudgment interest.

## I. TRIAL COURT PROCEEDINGS

The following summary is based on the trial court's written statement of decision, supplemented with evidence from the bench trial.

### A. PROJECT HISTORY AND DEVELOPMENT AGREEMENT

The Monterey County Board of Supervisors approved a 2,911-acre subdivision known as Monterra in 1987. Brothers Roger and Basil Mills formed Monterra LLC and purchased the undeveloped Monterra subdivision in 1995. After Monterra LLC acquired the Monterra subdivision, the owners of the Tehama subdivision (located immediately south of Monterra) entered into an agreement with Monterra LLC. Among other things, the agreement provided that Monterra LLC would transfer about 1,000 acres from Monterra to Tehama to create Cañada Woods North (where a golf course and a small number of residential units were to be built). Tehama would also allow lots in Monterra

2

to use Tehama's graywater sewage treatment system, and Monterra LLC would construct a potable water system to be used by lots in Monterra and Cañada Woods North.

Monterra LLC hired plaintiff via a handshake agreement to redesign Monterra as an "exclusive and environmentally-friendly development." The trial court found that the agreement was as follows: for design work plaintiff would charge its billing rate, actual consultant charges, and a five percent markup applied to the consultant charges; for construction work plaintiff would charge its actual costs for equipment and labor performed by plaintiff as well as the actual costs of its subcontractors and materialmen, plus a 25 percent markup of the construction labor costs to account for supervision, overhead, and profit.

Plaintiff developed Monterra between 1996 and 2008. That development work included "lot design and layout, locating building envelopes on each lot, water and sewage system layout and design, roadway design, construction and repair." Plaintiff developed Monterra in phases in order to build and sell a few houses at a time to raise capital to invest in each successive phase. Roughly half the lots in Monterra were developed and sold before Monterra LLC ran out of capital; those sales generated over $100 million. Part of the development included construction of a reverse osmosis water plant, which served the lots in the subdivision that had been sold to third parties.

Plaintiff and Monterra LLC entered into an oral contract providing for contractual interest in late 2000. Monterra LLC agreed to pay interest on unpaid balances at the rate of 10 percent. The trial court found that interest was "to accrue 60 days from the last day of the month in which the work was performed." (In determining the accrual period, the trial court acknowledged that trial testimony on that point was "often unclear, confusing and conflicting.")

Monterra LLC informed plaintiff in 2008 that it could no longer make payments, effectively breaching the contract. Plaintiff recorded two liens[1] to secure its right to money for two categories of work: water improvements throughout Monterra, and site improvements in phases seven and nine. The Water Lien was for water improvements "related to the expansion of a water and sewer system including the installation of new wells, lift stations and a larger reverse osmosis water plant to increase the water and sewer systems capacity to provide services to the last 85 unsold lots of the Monterra subdivision." The Site Improvement Lien "related to the installation of site improvements (roads, driveways, retaining walls, utilities) to benefit the lots located in Phases 7 and 9 of Monterra."

### B. LITIGATION, STATEMENT OF DECISION, AND JUDGMENT

Plaintiff sued Monterra LLC and defendants, alleging (among other things) breach of contract as to Monterra LLC and seeking lien foreclosure as to Monterra LLC and defendants. (The case was consolidated with a related breach of contract action by another contractor against Monterra LLC, which settled during trial.) Before trial, plaintiff and Monterra LLC agreed to a stipulated judgment. Monterra LLC stipulated that it owed over $9 million to plaintiff, that the amount due would be satisfied by a foreclosure of the liens against the 85 unsold lots, and that any amount not satisfied by foreclosure would become a judgment against Monterra LLC.

The case proceeded to a lengthy bench trial between plaintiff and defendants. The case was tried in two phases, liability and damages. Following the first phase, the trial court determined that defendants were liable for the Water Lien and the Site Improvement Lien. The trial court found that the liens could accrue contractual interest, but that the claimed lien amounts were based on excessive charges. The court found plaintiff had improperly applied the 25 percent markup for supervision, overhead, and

---

[1] What we will refer to as the Water Lien was recorded as several separate liens, one lien per relevant project phase.

profit to its *billing rates* rather than to the *actual costs* of labor, requiring recalculation of the amounts due under the liens. The court found that the excessive charges were not fraudulent, but rather the result of a good faith dispute about the correct billing calculation.

Regarding allocation of lien liability, the trial court considered defendants' argument that the Water Lien and Site Improvement Lien had been improperly recorded against only unsold lots in Monterra. The court determined that Monterra LLC had asked plaintiff to impose the liens on only those lots. The court noted that "completion of the infrastructure, even in areas not contiguous to all of the lots liened, was of benefit to all the lots liened." But the court reasoned the liens did "not have to be allocated evenly across all lots" based on "authority cited by [plaintiff] to the effect that the landowner and the materialman may agree to have a lien attach to some of the property but not others." The court found that Monterra LLC and plaintiff agreed "to such allocation in both (1.) agreeing that payments made were to be applied to non-liened work which benefitted only non-liened lots ... ; and (2.) agreeing that work for which the lien amounts are at issue here be apportioned only to certain lots which benefitted from the liened work." The court found the lien allocation a "bona fide attempt by the parties, under extremely difficult circumstances, equitably to avoid financial injury to third-party purchasers who had already purchased lots which were to be free of mechanic['s] liens," and that the parties could "agree to allocate or limit allocation of a lien claim to a specific lot or lots."

In the damages phase of trial, the court calculated the specific amounts due on the liens after hearing testimony from competing experts. The court noted that the claimed total amount due, before making any adjustments for overbilling, was over $6 million. The parties' experts recalculated the amount of the liens based on the court's finding in the first trial phase that the 25 percent markup was to be applied to plaintiff's actual costs rather than to its billing rates. The total was to include contractual interest at 10 percent per annum commencing 60 days after the end of the month in which the work was

5

performed, with "application of payments first to interest accrued and then to principal as of the date of the checks." The trial court selected plaintiff's expert's calculation of the corrected amount of the liens (totaling over $2 million). Noting that plaintiff's expert did not separate the Water Lien from the Site Improvement Lien, the court divided the defense expert's calculation of the Site Improvement Lien by that expert's calculation of the total amount of the liens to determine the percentage attributable to the Site Improvement Lien. The court then multiplied plaintiff's expert's total lien amount by the resulting percentage to conclude that the Site Improvement Lien totaled $132,661. To calculate the amount of the Water Lien, the trial court subtracted the resulting Site Improvement Lien amount from plaintiff's expert's total lien amount, reduced the resulting sum by a percentage agreed to by the parties to eliminate certain lots that had been released while the case was pending, and concluded that the remaining Water Lien amount was $1,462,459. After eliminating those lots that had been released, the number of liened unsold lots reduced from eighty-five (85) to fifty-eight (58). The court applied prejudgment interest at a rate of 10 percent per annum under Civil Code section 3287, subdivision (b), commencing one year after plaintiff filed its complaint.

The two liens were apportioned to specific lots in the judgment. The Water Lien was allocated to the remaining 58 unsold lots in Monterra, with a principal amount of $25,214.81 per lot plus $11,733.18 per lot in prejudgment interest. The Site Improvement Lien was allocated to the eight lots in phases seven and nine of Monterra, with a principal amount of $16,582.63 per lot plus $7,708.92 per lot in prejudgment interest. (The eight lots in phases seven and nine were liable for both liens.) All 58 unsold lots would share responsibility for plaintiff's costs, as well as postjudgment interest.

## II.  DISCUSSION

Defendants argue that plaintiff should not have been allowed to apply payments that should have reduced the lien amounts to other work in Monterra that was not the

6

subject of the liens, nor to allocate lien liability to certain lots even though the liens benefit all lots in the subdivision. Defendants also challenge the inclusion of contractual interest in the lien amounts, and the award of prejudgment interest.

## A. APPLYING PAYMENTS TO MAXIMIZE THE LIEN AMOUNTS

Plaintiff applied payments it received from Monterra LLC to debt that was not subject to liens, in effect increasing the amounts of the Water Lien and Site Improvement Lien. The trial court approved the application of Monterra LLC's payments to "lots which had been sold" before crediting those payments against the lien amounts. Defendants contend Civil Code section 1479 requires payments to be applied "first to interest then principal, to the oldest outstanding obligations." (Unspecified statutory references are to the Civil Code.) They note that applying payments in the order specified in section 1479, subdivision (3) would reduce the amounts due under the Water Lien and Site Improvement Lien.

We review a trial court's interpretation and application of statutes de novo. (*Silver v. Los Angeles County Metropolitan Transportation Authority* (2000) 79 Cal.App.4th 338, 347–348 (*Silver*).) We review the trial court's factual findings resolving disputed testimony for substantial evidence. (*Ibid.*)

### 1. Trial Evidence

Plaintiff's principal, Alan Williams, testified that during "the first year or so" of plaintiff's work on Monterra, Monterra LLC specified that its payments were to be applied to particular invoices from plaintiff. Both Williams and Monterra LLC's principal, Roger Mills, testified that Monterra LLC thereafter made all payments to plaintiff "on account." Williams testified that once Monterra LLC began paying on account, Mills left it to plaintiff's discretion where the payments were applied. Mills confirmed that after September 2000, Monterra LLC made payments on account rather than for specific invoices. Mills testified that he and Williams met monthly to review the preceding month's invoices.

7

Plaintiff's office manager testified about tracking invoices and payments. She maintained a spreadsheet for invoices related to the Monterra project. On that spreadsheet she always applied payments from Monterra LLC to the oldest outstanding balance. The invoice amounts were sometimes estimates, provided in response to requests by Williams. (We will refer to that spreadsheet as the "invoice spreadsheet" to differentiate it from the "interest spreadsheet" plaintiff prepared later to calculate contractual interest owed by Monterra LLC.) Williams testified that he and Mills used the invoice spreadsheet during their monthly meetings to determine the "order of magnitude" of what Monterra LLC owed, and not as a monthly statement showing how payments were being applied.

Williams testified that after recording the Water Lien and Site Improvement Lien, he created a color-coded spreadsheet breaking down everything he had billed to Monterra LLC between 2005 and 2008 into dozens of specific construction activities. (The color spreadsheet was admitted into evidence at trial.) Plaintiff color-coded the activities into three categories: construction activities for water infrastructure were highlighted in yellow (and formed the basis for the Water Lien); construction activities for road and other infrastructure work in phases seven and nine were highlighted in red (and formed the basis for the Site Improvement Lien); and construction activities outside of those categories were not highlighted. (Those latter activities consisted of "road improvements that were not water-related, or were specific to the particular developer" or lot owner.) Williams testified that he applied payments received from Monterra LLC to the unhighlighted construction activities (regardless of when those activities were completed) at Mills's request. Mills reportedly asked Williams to apply payments to construction activities that benefited only the lots Monterra LLC had already sold to third parties so that those third parties would not incur any lien liability. In its statement of decision, the trial court found that plaintiff had applied payments as requested by Monterra LLC to prevent purchasers of the sold lots from incurring lien liability.

8

### 2. Plaintiff's Application of Payments was Proper

Section 1479 designates the order of payments when a "debtor, under several obligations to another, does an act ... which is equally applicable to two or more of such obligations." (§ 1479.) If the debtor states at the time of performance an "intention or desire ... that such performance should be applied to the extinction of any particular obligation," the creditor must apply the payment as instructed. (*Id.*, subd. (1).) If the debtor does not instruct the creditor regarding how the payment should be applied, the "creditor, within a reasonable time after such performance, may apply it toward the extinction of any obligation, performance of which was due to him from the debtor at the time of such performance." (*Id.*, subd. (2).) And if neither party applies the payment to a particular obligation, the creditor must apply the payment to the obligations in the following order: interest due at the time of performance, principal due at the time of performance, the obligation earliest in date of maturity, an obligation not secured by a lien or collateral, and finally to any obligation secured by a lien or collateral. (*Id.*, subd. (3).)

The parties agree that Monterra LLC made all relevant payments "on account," meaning that Monterra LLC never directed plaintiff at the time of payment to apply payments to any specific invoice or category of work. As such, section 1479, subdivision (1) does not apply. The parties dispute whether this case is governed by subdivision (2) or subdivision (3) of section 1479.

Defendants argue that plaintiff "attempted to reallocate payments many months and years after those payments were received, and well after those payments were already applied to the oldest outstanding charges." They also contend plaintiff applied the payments to the unhighlighted category of invoices too late to fall under section 1479, subdivision (2), such that the default order of payment from section 1479, subdivision (3) required plaintiff to apply the payments to the obligations with the earliest date of

9

maturity (which in this case would mean the oldest outstanding invoices because the invoices all matured at the same rate).

The trial court heard conflicting testimony about whether plaintiff had ever formally applied payments to specific categories of work performed on the Monterra subdivision. The invoice spreadsheet and plaintiff's office manager's testimony about preparing it suggested that plaintiff had consistently applied payments to the oldest outstanding balances. But Williams testified that the invoice spreadsheet was used merely as a reference document during monthly meetings to show Mills the "order of magnitude" of what Monterra LLC owed. Williams's testimony provides substantial evidence to support the trial court's finding that plaintiff did not actually apply Monterra LLC's payments to specific categories of work until plaintiff prepared the liens at issue here. Such an application of payments made on account is permissible under section 1479, subdivision (2), which gave plaintiff discretion to apply the payments "toward the extinction of any obligation" so long as the application was made "within a reasonable time" after the payments were received. (§ 1479, subd. (2).)

Without citation to authority, defendants argue that plaintiff's application of payments was untimely because it occurred "many months and years after those payments were received." But there is longstanding authority interpreting section 1479 to the effect that "where the debtor has made no designation, the creditor, if entitled to make application, must make the application before suit is brought." (See *Joy v. Rousseau* (1925) 72 Cal.App. 179, 184.) We see no reason to depart from that authority.

In their reply brief, defendants argue that plaintiff's application of payments is unlawful because it harmed defendants. But here again defendants cite no authority supporting the proposition that a party violates section 1479 if it applies payments in a way that harms another party. Logic dictates that someone may suffer any time payment is applied to one debt rather than another. Detriment to a third party has been found relevant, but only in situations where a debtor initially directed a creditor to apply a

10

payment to a specific obligation and the payment was later applied to a different obligation. (E.g., *Johnston v. Groom* (1929) 99 Cal.App. 462, 464 [where debtor made a payment with directions to apply it to a specific account, "appropriation by either party cannot be changed so as to injuriously affect the rights of third parties"]; accord *Hart, Schaffner & Marx v. Vaughn* (1936) 17 Cal.App.2d 516, 519.) As it is undisputed that Monterra LLC made all payments on account, that rule does not apply here.

The trial court did not err when it approved plaintiff's application of Monterra LLC's payments to the unhighlighted category of work, which complied with section 1479, subdivision (2). Because the application was permissible, we do not reach plaintiff's argument that this was a "single obligation" case such that section 1479 was wholly inapplicable.

## B. WATER LIEN ALLOCATION

Defendants argue that the trial court erred by approving an agreement between plaintiff and Monterra LLC to charge only specified lots (i.e., the unsold lots) the costs of water improvements that benefited not only all lots in Monterra but also adjacent lots owned by Tehama.[2] Plaintiff argues that the Water Lien work benefited only the unsold lots, meaning that the trial court allocated the lien to all lots that benefited from the work. The parties' briefing presents two issues: determining the number of lots that benefited from the Water Lien work; and whether the Water Lien was properly allocated among the benefited lots.

---

[2] The record—and the parties' briefing—is ambiguous as to which specific lots outside Monterra the water improvements may have benefited. Per the original agreement between Monterra LLC and Tehama, the Monterra water system was to supply water to the Cañada Woods North development. Plaintiff refers to certain "Tehama lots" as benefiting from water infrastructure improvements (though plaintiff argues that Tehama already paid for its share of the improvements), while defendants refer to lots in the Tehama development as well as "property owned by the Cañada Woods Water Company." As Tehama owned both the Tehama and the Cañada Woods North developments, we will refer to property within those developments collectively as "lots owned by Tehama."

11

### 1. The Trial Court Correctly Found That the Water Lien Benefited All Lots in Monterra

As the contractor for Monterra who provided skill, labor, and materials for the subdivision, plaintiff was authorized to record "a lien upon the property upon which [it] bestowed labor or furnished materials ... for the value of such labor done or materials furnished." (Former § 3110[3]; see also Cal. Const., art. XIV, § 3 ["Mechanics, persons furnishing materials, artisans, and laborers of every class, shall have a lien upon the property upon which they have bestowed labor or furnished material for the value of such labor done and material furnished."])  The lien attaches to "the work of improvement and the land on which it is situated together with a convenient space about the same or so much as may be required for the convenient use and occupation thereof."  (Former § 3128.)

Regarding the geographic scope of a mechanic's lien, the California Supreme Court has observed that the " 'question is not so much as to the amount of land required for the area to be occupied by the [improvements], but rather as to the amount of land to be improved or benefited by the creation and use of the [improvements].' "  (*Cal. Corrugated Culvert Co. v. Stewart* (1934) 220 Cal. 104, 106–107 [lien for construction of a rice elevator and a barn applied to entire farm property because the improvements benefited the whole farm], citing *Western Well Works v. Cal. Farms Co.* (1923) 60 Cal.App. 749, 757 [lien for an irrigation well that extended to an area 100 feet in diameter around the well was too narrow; remanding for recalculation of lien's geographic scope because the completed well "would have sufficed for the irrigation of at least one, if not both, of the sections of land upon which it was to be located"].)  Determining the scope of a lien "must take into consideration the intended use for which

---

[3]  The Civil Code sections related to mechanic's liens were repealed, renumbered, and reenacted, effective July 1, 2012.  (§ 8052, subd. (a); Stats. 2010, ch. 697, §§ 16, 20, pp. 3804, 3810.)  The former Civil Code sections govern this matter because the liens were recorded before the effective date of the new law.

the [improvement] is erected. ... [I]f its use is dependent upon, and connected with the uses made of other buildings or the uses made of other portions of the tract of land upon which it is situate[d], then if all of the larger tract is required for the 'necessary and convenient use' of the [improvement] involved, such larger tract may properly be included." (*Anselmo v. Sebastiani* (1933) 219 Cal. 292, 298.)

The question of which standard of review applies to a trial court's decision regarding the amount of land associated with a mechanic's lien appears to be one of first impression. Other than dictum in two early decisions, the Supreme Court has never directly addressed the issue. (See *Green v. Chandler* (1880) 54 Cal. 626, 627 ["[T]he Mechanics' Lien Law makes it the duty of the Court to determine, on rendering judgment, the quantity of land which may be required for the convenient use and occupation of any building, improvement, or structure, which may be built thereon by any one claiming a lien."]; *Anselmo*, *supra*, 219 Cal. at p. 297 [" 'Determining the area of land that shall be included in ... a lien for the erection of a building is largely within the discretion of the trial court, and unless abused, will not be disturbed.' "].) Because determining the amount of land benefited by a mechanic's lien requires a trial court to resolve disputed evidence and make factual findings, we apply the substantial evidence standard of review. (See *Moorefield Construction, Inc. v. Intervest-Mortgage Investment Co.* (2014) 230 Cal.App.4th 146, 154.)

Before examining the record for substantial evidence, we must resolve a dispute between the parties about what the trial court actually decided regarding which lots benefited from the water improvements. Plaintiff urges that substantial evidence supports a "conclusion that the work in the liens benefitted the lots liened and not the un-liened lots," whereas defendants contend the trial court decided that the water improvements benefited all the lots in Monterra. The disagreement appears to stem from an ambiguity in the statement of decision where the trial court states it was acceptable for plaintiff to apportion the Water Lien "only to certain lots which benefitted from the liened work."

13

Read in isolation, that statement could mean either that plaintiff apportioned the lien to only those lots that benefited from the water improvements, or alternatively that plaintiff apportioned the lien to certain lots that benefited from the water improvements while leaving unencumbered other lots that also benefited from those improvements. But in the context of the trial evidence we will now discuss—as well as the court's repeated references to the water improvements as "designed to be an integrated whole serving all the lots in each phase"—it is clear the trial court found that the improvements benefited all lots in Monterra.

Plaintiff's trial theory was that it had allocated the Water Lien to the remaining unsold lots because those were the only lots that benefited from the Water Lien improvements. Consistent with that position, Williams testified that he did not think the lots already sold to third parties benefited from the Water Lien improvements because those lots were receiving water from the existing water treatment plant. Williams noted that the existing water treatment plant had the capacity to serve the sold lots.

But Williams also acknowledged that the Monterra water system was designed to be an integrated whole serving the entire subdivision. Williams explained that the county initially required Monterra LLC to build a smaller test reverse osmosis plant (i.e., the plant serving the sold lots), whose capacity would be expanded later by building the High Well Treatment Plant (the costliest improvement in the Water Lien). Williams confirmed that once the High Well Treatment Plant was finished, it would "supply water to all 170 lots" in Monterra. The existing smaller water plant would then be converted to treat brine effluent that was the byproduct of processing water at the High Well Treatment Plant. Williams also acknowledged that certain improvements that were part of the Water Lien were already operational, meaning that they were being used by the sold lots even though those lots were not included in the Water Lien. Those improvements included wells that were providing water to the existing water plant.

14

Plaintiff initially recorded a lien for the water-related improvements against all lots in Monterra, suggesting plaintiff believed the improvements benefited all of those lots. Plaintiff later released the original lien and recorded the liens that make up the Water Lien, which name only the 85 unsold lots. Williams testified that he reduced the number of lots against which plaintiff claimed the Water Lien at Mills's urging. Williams testified that Mills expressed three concerns about the liens being recorded against all lots (admitted over a hearsay objection for the limited purpose of explaining Williams's conduct): Mills thought it would be unfair to the third parties who had purchased lots to have to pay even though they had already "paid for their share of things"; Mills believed the improvements in the Water Lien "benefited the developers' lots"; and Mills feared that a blanket lien would taint the project.

The trial court's statements at the final hearing of phase one of the trial support our conclusion that the trial court determined the Water Lien benefited all lots in Monterra. The court stated it interpreted case law as allowing the "owner and the contractor to agree what properties can be liened, and it does not require a uniform lien ... [or] that the lien be allocated evenly across all the properties." In allocating the Water Lien to the unsold lots, the court summarized "the problem" as follows: "Either you impose those liens on individual purchasers that have already paid for those lots and bought them; or the developer goes unpaid; or you find that the lenders, who were in a position to be able to have -- to insist on some kind of a control[] account, a bond, could have covered it."

The trial court's statement of decision describes the Water Lien as consisting of improvements to "increase the water and sewer systems capacity to provide services to the last 85 unsold lots." The court found the water and sewer infrastructure "was designed to be an integrated whole serving all the lots in each phase, no phase of which could have operated independently of the others." The court noted that the initial water plant was an experimental undertaking, and that "it was always anticipated that this first

15

plant would not be sufficient to supply water to all of the lots in Monterra." The court found the High Well Treatment Plant was "an integral part of the entire development project." Regarding allocation of the liens, the court found that "completion of the infrastructure, even in areas not contiguous to all of the lots liened, was of benefit to all the lots liened." Finally, the trial court found that plaintiff and Monterra LLC could agree that "work for which the lien amounts are at issue here be apportioned only to certain lots which benefitted from the liened work."

Substantial evidence supports the trial court's conclusion that the Water Lien improvements benefited all lots in Monterra. Williams acknowledged that the plan all along was to build the smaller water plant to demonstrate the feasibility of reverse osmosis, and then build the High Well Treatment Plant which would have the capacity to serve all lots in the development. Williams also acknowledged that the Water Lien included charges associated with wells already in operation, providing evidence that the improvements in the Water Lien were in fact directly benefiting the sold lots. To support its argument that sold lots did not need the Water Lien improvements, plaintiff repeatedly cites a letter from an engineer stating that the existing water plant had enough capacity to serve the sold lots. But the letter also notes that the "intent for many years has been to replace the existing 80 [gallons per minute] plant with the High Well treatment plant (140 gpm) and convert the existing plant into a brine concentration facility." We therefore find no error in the trial court's conclusion that the Water Lien improvements benefited all lots in the subdivision.

### 2. The Water Lien Should Not Have Been Limited to the 85 Unsold Lots

Former section 3110 states that a mechanic's lien extends to all "property upon which [the party claiming the lien has] bestowed labor." Whether a lien under former section 3110 for work that benefited certain lots may be allocated to only a subset of those lots presents a question of law we review de novo. (*Diamond v. Superior Court* (2013) 217 Cal.App.4th 1172, 1188 ["Statutory interpretation involves purely legal

16

questions to which we apply the independent standard of review."] (*Diamond*); see also *A.A. Baxter Corp. v. Home Owners & Lenders* (1970) 7 Cal.App.3d 725, 732 (*Baxter*) ["As these liens are the creatures of statute the objects thereof are limited to those designated by the statute."].)

In finding that plaintiff and Monterra LLC could "agree to allocate or limit allocation of a lien claim to a specific lot or lots," the trial court relied on three cases: *B. & J. Const. Co. v. Spacious Homes, Inc.* (1962) 204 Cal.App.2d 216 (*B. & J.*); *Rodeffer Industries, Inc. v. Chambers Estates, Inc.* (1968) 263 Cal.App.2d 116 (*Rodeffer*); and *Baxter*, *supra*, 7 Cal.App.3d 725. We will briefly summarize the cases and explain why the trial court's decision must be reversed.

The B. & J. Construction Company agreed to grade and fill land for a contractor; the land to be graded covered two tracts. (*B. & J.*, *supra*, 204 Cal.App.2d at pp. 218, 222.) B. & J. graded the two tracts and billed the contractor for over $30,000. (*Id.* at p. 218.) B. & J. was paid over $20,000, including one payment for $10,000. (*Id.* at pp. 219, 221.) The $10,000 check contained the following notation: " 'Endorsement of this check relinquishes all mechanic['s] lien rights and all labor lien rights for labor and materials furnished on' " one of the two tracts. (*Id.* at pp. 221–222.) B. & J. recorded a lien against both tracts for the roughly $10,000 it was still owed. (*Id.* at p. 222.) The lower court found that B. & J. had forfeited its lien by, among other things, including both tracts in its lien claim. (*Id.* at p. 221.) In reversing, the *B. & J.* court interpreted the language on the $10,000 check as "an offer to apportion the cost of the improvement in such a way as to give [the property owner] the benefit of a lien-free area." (*Id.* at p. 222.) The court reasoned that by endorsing the check, B. & J. agreed to "allocate some of the money theretofore paid as full payment on [one tract], and to consider the unpaid balance as entirely attributable to [the other tract]." The appellate court concluded that while B. & J. improperly included both tracts in its lien claim, it was still entitled to the

17

outstanding lien balance on remand after amending the lien to impose it against only the remaining tract. (*Id*. at pp. 222–223.)

Rodeffer was a concrete supplier for a 146-lot residential subdivision. (*Rodeffer*, *supra*, 263 Cal.App.2d at p. 117.) Rodeffer received periodic payments by checks which included written vouchers; the check/voucher combinations were "joint checks" payable to both Rodeffer as concrete supplier and also the subcontractor that actually poured the concrete at the subdivision. The vouchers stated they were to be applied to "labor and/or materials furnished to ... specifically designated lots situated" in the subdivision. (*Id.* at pp. 117–118.) Rodeffer received a portion of each check's amount (representing the sum owed for the concrete supplied for the lots specified in the voucher), and the subcontractor retained the remainder. (*Ibid.*) Rodeffer sued to foreclose a lien for the outstanding balance associated with material supplied to the subdivision. On the defendant subdivision owner's claim that the entire amount of the checks should have been credited toward Rodeffer's outstanding balance for the subdivision, the *Rodeffer* court concluded that "issuance of a joint check payable to a materialman and a subcontractor in payment of labor and materials for *specifically designated lots* does not require that the materialman credit the entire proceeds of such check against not only materials delivered to the lots for which the check was expressly issued, but also against all other materials furnished on a particular construction project." (*Id.* at p. 119.)

In *Baxter*, the A.A. Baxter Corporation agreed to act as a contractor for a tract to be subdivided into three units that would each contain multiple houses. (*Baxter*, *supra*, 7 Cal.App.3d at p. 728.) A.A. Baxter worked on the project for several months, resulting in an unpaid balance of over $125,000. It recorded a lien for the unpaid balance against the third unit of the subdivision and undeveloped land on the tract; the first and second units were not included in the lien. (*Id.* at pp. 729–730.) The defendants were owners of residences in the third unit and their lenders. (*Id.* at p. 729.) A.A. Baxter's principal was also a limited partner in Harbor Crest, the company that owned the tract. The evidence

18

showed that A.A. Baxter's principal knew that Harbor Crest was in financial trouble, and made an agreement with Harbor Crest to subject the lots in the second and third units "to a secret claim of lien" whereby A.A. Baxter would delay assertion of a lien claim on the first unit so that lots in the other units could be sold without disclosing that they might later be subject to lien liability. (*Id.* at pp. 730–731.) A.A. Baxter obtained a money judgment against Harbor Crest, but was denied foreclosure of its lien against the homeowners and lenders from the third unit. (*Id*. at p. 730.)

The *Baxter* court affirmed, finding that the lien was untimely and that A.A. Baxter had purposefully elected to impose the lien on only a subset of the lots improved by the liened work. (*Baxter*, *supra*, 7 Cal.App.3d at p. 731.) The court explained that the relevant mechanic's lien law in effect at the time provided that any " 'person who, at the instance or request of the owner ... of any lot or *tract of land*, grades, fills in, or otherwise improves the same, ... has a lien upon said lot or tract of land for his work done and materials furnished.' " (*Id.* at p. 732.) The court interpreted that section to mean that the "object of the lien conferred ... is the 'tract of land' graded or otherwise improved," thus the lien applied to the *entire* tract, not merely to a part of the tract. (*Ibid.*) But the court also noted that a contractor may waive the right to lien a portion of a tract by his or her conduct (such as by failing to timely record a lien claim). (*Ibid.*) The court explained that where "work is performed on an entire tract there is a difference between limiting enforcement of the contractor's lien to a part of the tract [due to waiver by the contractor] and permitting the contractor to claim a lien upon only a part of the tract." (*Ibid.*) The court concluded that the defendants were "entitled to rely upon the assumption any claim of lien by a contractor for grading the entire tract would be upon the entire tract; would not be limited to the lots in [the third unit]; and, in any event, would not subject their property to more than a proportionate share of the amount of the claimed lien." (*Id.* at pp. 732–733.) The appellate court affirmed the denial of recovery on the lien foreclosure, finding that the lien was untimely; that A.A. Baxter had improperly sought to recover its

19

unpaid balance from only a limited subset of the lots that had been improved by the liened work; and that A.A. Baxter was barred by the equitable doctrines of estoppel and laches.  (*Id.* at pp. 733–735.)

Here, the trial court stated that plaintiff and Monterra LLC could "agree to allocate or limit allocation of a lien claim to a specific lot or lots."  Similarly, plaintiff argues that plaintiff and Monterra LLC "could agree to deem payments applicable to certain lots so the work on those lots was fully paid, and leave the work on other lots unpaid," effectively allocating payments "so that the sold lots were lien-free."  While that may have been the parties' intent, the actual allocation of payments did not legally accomplish the goal of freeing the sold lots from lien liability.  Monterra LLC owed plaintiff a lump sum for its work on the water improvements, which we have already concluded benefited all lots in the subdivision.  There is no evidence that Monterra LLC ever directed plaintiff to apply payments to the sold lots' proportionate share of the water improvements.  Though Monterra LLC did direct plaintiff to apply payments to the unhighlighted category of work shown on the color spreadsheet, Monterra LLC's direction to apply payments toward the sold lots' liability for work *other than* the water improvements is irrelevant to the allocation of the Water Lien.

We find the facts of this case to be more similar to those in *Baxter* than to those in *B. & J.*  To paraphrase *Baxter*, defendants were entitled to rely on the assumption that any claim of lien by plaintiff for water improvements benefiting the entire Monterra development would be imposed upon the entire development, would not be limited to the unsold lots, and would not subject those unsold lots to "more than a proportionate share of the amount of the claimed lien."  (*Baxter*, *supra*, 7 Cal.App.3d at pp. 732–733.)

Plaintiff argues the trial court's decision was consistent with *Rodeffer*, *supra*, 263 Cal.App.2d 116.  But unlike the owner in *Rodeffer* that directed payments to be applied to work on specific lots, Monterra LLC made payments on account and never

directed plaintiff to allocate payments to the sold lots' proportionate share of the water improvements.

Plaintiff contends that reversing the trial court would be inequitable because it would be equivalent to a finding that plaintiff "released its lien on the sold lots while money was still owing on the work benefitting those lots." We acknowledge that our decision will reduce the total amount plaintiff receives under the Water Lien because plaintiff can no longer recover anything from the lots not encumbered by the Water Lien. But as we have explained, there is no legal support for the trial court's selective allocation of liability for the Water Lien. Plaintiff could have avoided this result by foreclosing the original mechanic's lien for the water improvements, which it recorded against all lots in Monterra.

Plaintiff notes that defendants "did not require control accounts to ensure disbursement of their loan funds to pay the mechanics -- which would have reduced or eliminated the nonpayment of [plaintiff's] invoices -- and Defendants did not obtain payment bonds which would have provided them priority over mechanic's liens." (Citing former §§ 3123, 3137, 3139.) But our decision does not eliminate defendants' liability for the Water Lien; we merely conclude that the trial court's decision improperly imposed greater lien liability on defendants than their proportionate share. Defendants' failure to use control accounts or payment bonds is irrelevant to the appropriate allocation of the Water Lien.

The trial court reasoned that selective allocation of the liens was consistent with the Subdivided Lands Act. (Bus. & Prof. Code, § 11000 et seq.) By noting that the Subdivided Lands Act makes it unlawful for a developer to sell a lot within a subdivision if it is subject to a blanket encumbrance (such as a mechanic's lien), the trial court appeared to be concerned that applying the lien to the sold lots could subject Monterra LLC to liability for violating the Subdivided Lands Act. (See Bus. & Prof. Code,

21

§ 11013.1.)  But nothing in that statutory scheme purports to supersede the Civil Code provisions related to mechanic's liens.

### 3.  Plaintiff is Entitled to Proportionate Recovery On Remand

Defendants argue that because plaintiff asserted the Water Lien against only 85 lots instead of against all lots that benefited from the water improvements, plaintiff should not be entitled on remand to recover from defendants the amount of the Water Lien that is proportionately attributable to the lots still at issue in this case.  Defendants rely on *Baxter*, *supra*, 7 Cal.App.3d 725, and *Cook v. Cappellino* (1929) 101 Cal.App. 77 (*Cook*).

As we noted in our previous summary, the *Baxter* court affirmed the denial of lien recovery to the contractor because the contractor had intentionally and improperly sought to recover the lien amount from a subset of the affected lots based on a secret agreement with the property owner.  (*Baxter*, *supra*, 7 Cal.App.3d at pp. 733–735.)  In finding that the contractor had improperly recorded its lien against only a subset of the benefited lots, the appellate court observed:  "Even assuming the claim of lien filed by [A.A. Baxter] effectively subjects ... property to liens for apportioned shares of the amount unpaid [A.A. Baxter] on its contracts with [the land owner], [A.A. Baxter] did not seek such relief; instead, [it] sought to subject the whole of [the defendants'] properties to the whole of the unpaid amount due it; and neither the pleadings nor the proof in the case would support a judgment decreeing foreclosure on an apportionment basis."  (*Id.* at p. 733.)

*Cook* involved a lien foreclosure action by plaintiffs who had furnished materials to a corporation as agent for the owners of real property for construction on that property. (*Cook*, *supra*, 101 Cal.App. at pp. 77–78.)  Each plaintiff had recorded multiple liens against multiple lots, but their lien foreclosure action sought the full amount due them without identifying any particular lien recorded against any specific lot or landowner. The lower court found that the lien foreclosure actions were untimely, and denied relief based on the liens.  Two plaintiffs appealed, seeking to revive the lien foreclosure action.

22

The *Cook* court rejected their arguments, explaining that the plaintiffs could not recover the full amount of their liens against any single owner because each lien included "improvements upon the properties of all, nor could one lien for either total amount be charged against all, as prayed, without a proportionate segregation." (*Id.* at p. 79.) The court concluded that because "no specific lien was pleaded or sought to be established as against any particular landowner, ... no judgment could have been rendered for the declaration of liens which were not pleaded." (*Ibid.*)

*Baxter* and *Cook* are of little persuasive value regarding defendants' proportionate liability for the Water Lien. Neither case stands for the proposition that proportionate allocation is not available unless specifically pleaded. Given that the mechanic's lien laws are "remedial legislation, to be liberally construed for the protection of laborers and materialmen" (*Connolly Development, Inc. v. Superior Court* (1976) 17 Cal.3d 803, 826–827), we believe that trial courts retain discretion to craft a remedy (such as proportionate allocation) that allows a lienholder to recover as much of his or her claim as legally possible. Defendants cannot claim unfair surprise regarding proportionate liability given that the issue was thoroughly developed by the parties during trial.

## C. SITE IMPROVEMENT LIEN ALLOCATION

Defendants argue the trial court erred in allocating the Site Improvement Lien to only the unsold lots in Monterra phases seven and nine. They acknowledge that the Site Improvement Lien consists solely of "improvements within the physical boundaries of Phases 7 and 9," but argue that the improvements benefit the entire subdivision because the "road[] and associated infrastructure that [plaintiff] constructed connects with the roads in all other phases" of Monterra. They also contend that the trial court's finding that Monterra was a single "work of improvement" under former section 3106 compels a finding that the Site Improvement Lien benefited all lots in the subdivision.

As we have discussed, we review the trial court's determination of the amount of land necessary for the convenient use and occupation of improvements that are the

23

subject of a lien for substantial evidence, and we review the trial court's allocation of the lien amount among the benefited lots de novo (*Diamond*, *supra*, 217 Cal.App.4th at p. 1188).

Phases seven and nine are adjacent to each other.  Phase seven contains two lots, and phase nine contains six lots.  Monterra LLC still owned all lots in phases seven and nine when plaintiff recorded the Site Improvement Lien.  Paseo Venado is the only road in phases seven and nine, and it was built as part of the Site Improvement Lien work.  It begins on the western boundary of phase seven, travels between the two lots in phase seven, continues along the phase nine southern border, and ends near the eastern boundary of phase nine.  Paseo Venado is a spur route off the more arterial Via Malpaso. Paseo Venado provides the only road access to lots in phases seven and nine (with the possible exception of one lot in phase seven that has a different road as its western boundary).  Because it dead-ends in phase nine, Paseo Venado does not provide access to lots in phases other than phases seven and nine from any of the Monterra external entrances.  The trial court's statement of decision describes the Site Improvement Lien work as "related to the installation of site improvements (roads, driveways, retaining walls, utilities) to benefit the lots located in Phases 7 and 9 of Monterra."  We interpret that language as a factual finding that the Site Improvement Lien benefited only the lots in phases seven and nine.

### 1. The Site Improvement Lien Benefited Only the Lots Liened

Defendants' argument regarding which lots benefited from the Site Improvement Lien work is similar to their argument about which lots benefited from the Water Lien work.  But the nature of the improvements in the two liens is distinct.  Whereas the Water Lien reflected improvements that would have led to the operation of a water treatment plant providing water to all lots in Monterra, the Site Improvement Lien work involved building a road and related infrastructure serving only the lots in phases seven and nine. The connection between those improvements and lots outside phases seven and nine is

24

far more attenuated than the connection between the water improvements and all the lots in Monterra.

*Forsgren Associates, Inc. v. Pacific Golf Community Development LLC* (2010) 182 Cal.App.4th 135 (*Forsgren*) is instructive regarding whether a lien can legally attach to adjacent property. Forsgren was a general contractor for a project that involved constructing a golf course and flood channel. The golf course was supposed to be the first phase in a development project that was designed eventually to include residential lots and parks on property adjacent to the golf course property. (*Id*. at pp. 138, 140.) Forsgren performed construction on the golf course. Most construction occurred on the golf course property, but some elements of the golf course construction (the " 'back tee' " of one hole and some topsoil relocation) occurred on a portion of an adjacent property on which the residential units were to be constructed. (*Id.* at pp. 141–143.) After performing over $1.5 million of unpaid work, Forsgren brought a breach of contract action against the developer and was permitted by the lower court to foreclose a mechanic's lien recorded against both the golf course property and the entire adjacent property. (*Id.* at pp. 143–144.)

On appeal, the *Forsgren* court noted that the mechanic's lien "attached to all such property on which the golf course construction was 'situated together with a convenient space about the same or so much as may be required for the convenient use and occupation thereof.' " (*Forsgren*, *supra*, 182 Cal.App.4th at p. 150, quoting former § 3128, italics omitted.) The court reasoned that to determine the scope of a mechanic's lien, a trial court is "required to take into consideration the use and purpose for which the improvement was intended." (*Id.* at p. 151.) The scope " 'largely depends on the character of the development.' " (*Ibid.*) Summarizing case law, the *Forsgren* court stated that in order for a "lien to attach to the adjacent property, the purpose for which the building or improvement in question is erected must be 'so intimately and directly connected with the operations carried on in the adjacent buildings as to constitute it an

25

essential part and parcel' of the improvement." (*Id.* at p. 153.) The court concluded that the golf course mechanic's lien did not attach to the *entire* adjacent property "because not all of the adjacent property was required for the convenient use and occupation of the golf course." (*Id.* at p. 139.) The lower court was directed to enter a new order attaching the lien to the limited portion of the adjacent property where Forsgren had actually performed work during golf course construction. (*Id.* at p. 160.)

We find *Forsgren*'s reasoning persuasive. The Site Improvement Lien work was performed and located only within phases seven and nine. To require lots in adjacent Monterra phases to share proportionate liability for the Site Improvement Lien, the improvements supporting that lien would have to be " 'so intimately and directly connected with the operations carried on in the adjacent' " Monterra phases as to make them an " 'essential part and parcel' of the improvement." (*Forsgren*, *supra*, 182 Cal.App.4th at p. 153.) Substantial evidence supports the trial court's conclusion that there was no such functional connection here. The road built as part of the improvements is of little, if any, benefit to the lots in Monterra located outside phases seven and nine because it begins and dead-ends inside those two phases and does not provide access to any lots outside phases seven and nine. The trial court's decision attaching the Site Improvement Lien only to the lots in phases seven and nine was correct.

Defendants argue that because the trial court found Monterra was a single "work of improvement" as defined in former section 3106, it necessarily had to conclude that the Site Improvement Lien work benefited the entire subdivision. (See former § 3106 [" 'Work of improvement' includes but is not restricted to the construction ... of any building, ... or road, ... [and] the filling, leveling, or grading of any lot or tract of land"].) In finding that the "Monterra project was a single work of improvement for purposes of determining the validity and the timeliness of the liens asserted," the trial court focused almost exclusively on the improvements associated with the Water Lien. The court

described the stages of building the water system for the project, starting with the first plant that was to be followed by the High Well Treatment Plant; the trial court then specifically found that the "second phase of the water system (the 'high well treatment plant') was an integral part of the entire development project." Defendants offer no authority for the proposition that a lien for discrete improvements within a larger scope of work cannot be found to benefit fewer than all lots involved in the development as a whole. The nature and extent of the benefits derived from the underlying work largely determine the scope of the lien.

Defendants complain in their reply brief that plaintiff's position as to the Site Improvement work benefiting only the lots in phases seven and nine is inconsistent with the position another plaintiff took at trial. They note that the principal for a contractor who settled with defendants during trial testified that the work on a spur road in phase six of Monterra benefited the entire subdivision because a "completed subdivision has to add value to all of the parcels." Defendants appear to suggest that because the other contractor was also represented by plaintiff's counsel, plaintiff's position should be disregarded. But different parties are entitled to have different theories of the case, and the ultimate decision of the Site Improvement Lien's scope was a question for the trier of fact, here the trial court.

### D. CONTRACTUAL INTEREST IN THE LIENS

The trial court determined that plaintiff and Monterra LLC agreed by oral contract that Monterra LLC would pay contractual interest at a rate of 10 percent per annum for past-due invoices. The trial court also determined that unpaid contractual interest could legally be included in the Water Lien and the Site Improvement Lien. Defendants argue there was no substantial evidence to support the existence of an oral agreement to pay contractual interest, and that even if such an agreement existed the mechanic's lien law precludes adding contractual interest to the amount of a mechanic's lien.

27

### 1. Substantial Evidence Supports the Existence of an Interest Agreement

Oral contracts are authorized by California law. (§ 1622.) Every term of an oral contract need not be stated in minute detail. (*Skirball v. RKO Radio Pictures, Inc.* (1955) 134 Cal.App.2d 843, 861.) But to be enforceable, there must at a minimum be evidence of a " ' "meeting of the minds upon the essential features of the agreement, and [evidence showing] that the scope of the duty and limits of acceptable performance be at least sufficiently defined to provide a rational basis for the assessment of damages." ' " (*Scott v. Pacific Gas & Electric* (1995) 11 Cal.4th 454, 467.) "Where the existence of a contract is at issue and the evidence is conflicting or admits of more than one inference, it is for the trier of fact to determine whether the contract actually existed." (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 208.) We review those factual findings for substantial evidence. (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 987.)

Substantial evidence supports the trial court's decision that an oral contract existed with the following essential features:  plaintiff and Monterra LLC agreed to pay interest on past-due invoices; the interest rate would be 10 percent; and interest would accrue "60 days from the last day of the month in which the work was performed." Williams testified that he approached Mills at the end of 2000 when Monterra LLC's unpaid balance was over $2 million. The two made a handshake agreement that Monterra LLC would pay interest at a rate of 10 percent on outstanding balances, starting in January 2001. Mills confirmed the existence of that agreement in his trial testimony, explaining that he agreed to pay interest because he recognized that plaintiff would be in effect financing the project. Mills testified that he could not remember the precise details regarding interest accrual, but that he recalled it would "accrue in either 30 days after the end" of the month when the work was completed, "or 60 days." He noted that he would have wanted the accrual period to be as long as possible, meaning he "might have pushed for 60 days." Williams testified that interest "was due the month after we did the work," and that "interest would be charged in the month afterwards."

28

Defendants challenge the finding of an oral contract because "there was no evidence that Mills and Williams ever agreed on the essential term of when interest would begin to accrue." In selecting a 60-day accrual period as the "most reasonable conclusion under the circumstances," the trial court chose the period that was more beneficial to Monterra LLC (and, by extension, defendants). The trial court was entitled to credit Mills's testimony that interest accrued 60 days after the month the work occurred. Indeed, in their reply brief defendants "concede that substantial evidence exists to support such a finding" that the parties agreed to a 60-day accrual period.

Defendants urge viewing the testimony about the interest agreement "with extreme skepticism, given the wealth of contrary evidence presented to the trial court." Defendants cite evidence of no oral contract to pay interest, including: the lack of contemporaneous documentary evidence showing that plaintiff was charging interest; the lack of a written contract to charge interest; plaintiff's office manager's testimony that she did not track interest owed until preparing the liens in 2008; that the invoice spreadsheet the office manager used until preparing the liens did not track interest; and that financial information Monterra LLC reported to creditors did not show that plaintiff was charging interest. But as our review is for substantial evidence, we will not reverse merely because there was evidence to support a different decision by the trial court. (*Heard v. Lockheed Missiles & Space Co.* (1996) 44 Cal.App.4th 1735, 1747 ["All factual matters must be viewed in favor of the prevailing party and in support of the judgment. All conflicts in the evidence must be resolved in favor of the judgment."].) Substantial evidence supports the trial court's finding that an oral agreement for contractual interest was formed.[4]

---

[4] Plaintiff urges in its cross-appeal that if we find the contract to pay interest indefinite and therefore unenforceable, we should find that the parties actually agreed to a 30-day accrual period. Because substantial evidence supports the trial court's decision, a remand on this point is not necessary.

## 2. Contractual Interest was Improperly Included in the Liens

Defendants argue that even assuming an agreement to pay contractual interest exists, the trial court was precluded by law from including contractual interest in the Water Lien and Site Improvement Lien. Plaintiff raises a new argument on appeal: that the liens need not be remanded for recalculation because as "a matter of the facts, no interest is in the lien, because [plaintiff's] and the trial court's allocation of payments paid off the interest owing and part of the principal balance for the work." (Italics and underlining omitted.) The amount of a mechanic's lien "shall be for the reasonable value of the labor, services, equipment, or materials furnished or for the price agreed upon by the claimant and the person with whom he or she contracted, whichever is less." (Former § 3123, subd. (a).) Whether former section 3123 allows for the recovery of contractual interest as part of a mechanic's lien is a question of statutory interpretation we review de novo. (*Silver*, *supra*, 79 Cal.App.4th at p. 353.) We review the trial court's factual findings resolving disputed testimony for substantial evidence. (*Ibid.*)

The trial court found that "charges for many items (primarily labor) in [plaintiff's] billings were significantly in excess of the rates provided for by the contract," and that those excessive charges were not commercially reasonable. The court determined that the oral contract between plaintiff and Monterra LLC provided that a 25 percent markup for supervision, overhead, and profit was to be applied to plaintiff's actual labor costs rather than to its billing rates; applying the markup to plaintiff's actual cost amounts was "not only the number to which the parties agreed the percentage would be applied, but also the number that is commercially reasonable in support of the lien claim."

The statement of decision separately addresses contractual interest, concluding that "interest called for by a contract, so long as not a penalty in nature, is recoverable in a mechanic's lien action." (Citing *Lambert v. Superior Court* (1991) 228 Cal.App.3d 383 (*Lambert*); *Abbett Electric Corp. v. California Fed. Savings & Loan Assn.* (1991) 230 Cal.App.3d 355 (*Abbett*).) The trial court acknowledged that under former

section 3123 it must determine "the amount of the contract price or reasonable value (whichever is less)" for the liens. The court decided that plaintiff was "entitled to recover what its charges were had the charges been made in accordance with the parties' agreement as determined by the court, and that charges as allowed by the court were reasonable and added value to the lots."

Under former section 3123, to calculate the amount of each lien the trial court had to determine two figures: first, the reasonable value of the liened work; and second, the agreed upon contractual price for that work. The court was then required to award plaintiff the lesser of the two amounts. The trial court found that the parties' contract price without interest (basically, costs plus a 25 percent markup) was commercially reasonable, which we interpret as a finding that the contract price and the reasonable value of the liened work were one and the same. Equating the contract price with reasonable value is supported by evidence that plaintiff's improvements added value to the subdivision and that the contract as modified by the trial court was commercially reasonable.

But rather than awarding plaintiff the "reasonable value" of the liened work— which the court found was equal to the contract price without interest—as required by former section 3123, the trial court *added* contractual interest to the reasonable value. The contractual interest added no value to the liened work; it was instead a method of compensating plaintiff for Monterra LLC's failure to timely pay invoices. Because the court found that the reasonable value of the liened work equaled the contract price without interest for that work, and the contractual interest provision added no additional value to the liened work, the trial court erred by including contractual interest in the amount of the liens.

The trial court distinguished *Lambert* and *Abbett* as involving remedies for breach of contract or failure to perform, whereas the contractual interest agreement between plaintiff and Monterra LLC was "simply that the amount due for payment under the

31

contract will increase in the event that payment is not made by a certain date." (See *Lambert*, *supra*, 228 Cal.App.3d at pp. 388–389 [delay damages cannot be included in a mechanic's lien]; *Abbett*, *supra*, 230 Cal.App.3d at p. 358 [attorney fees cannot be recovered under the mechanic's lien law].) But the distinction the trial court drew is without legal significance. As the *Lambert* court persuasively explained, the "function of the mechanic's lien is to secure reimbursement for services and materials actually contributed to a construction site, not to facilitate recovery of consequential damages." (*Lambert*, at p. 389.)

As to plaintiff's new argument about interest not being included in any of the liens as a matter of fact, the trial court never made a finding that no contractual interest remained in the liens. And the expert spreadsheet plaintiff cites (exhibit No. CDC-235) is not the spreadsheet the trial court actually relied on to determine the amount of the liens (exhibit No. D-597). Though plaintiff may be able to show on remand that excluding contractual interest will not impact the amount of the liens, the record is insufficiently developed for us to decide the issue on appeal.

### E. PREJUDGMENT INTEREST (§ 3287)

Defendants argue that plaintiff was not entitled to prejudgment interest because a lien foreclosure action is not a "cause of action in contract" under section 3287, subdivision (b) (section 3287(b)). They also contend that even assuming prejudgment interest was legally available under section 3287(b), the trial court abused its discretion by awarding prejudgment interest and applied the wrong interest rate.

The trial court deferred consideration of whether plaintiff was entitled to "prejudgment interest under Civil Code sections 3287 and 3288" until the second phase of trial. Plaintiff argued it was entitled to prejudgment interest under either section 3287 (because the damages were sufficiently certain) or section 3288 (because the mechanic's lien recovery was an obligation not arising from contract). Defendants countered that plaintiff was not entitled to prejudgment interest, contending that section 3287,

32

subdivision (a) did not apply because the damages were uncertain; section 3287(b) did not apply because the damages were uncertain and the equities did not favor an award of interest; and section 3288 did not apply because it "simply defies common sense to even suggest [plaintiff's] alleged right to recovery does not stem from its contractual rights." The trial court reasoned that section 3288 did not apply because "the mechanic's lien arises from a contract claim." The court concluded that the equities favored awarding prejudgment interest under section 3287(b) because plaintiff had to wait a long time to receive a favorable judgment; plaintiff had to borrow substantial sums of money to keep the project going; and defendants could have tendered a sum at the beginning of the case. The court determined prejudgment interest would accrue at 10 percent beginning one year after the complaint was filed.

## 1. Section 3287(b) Applies to Mechanic's Lien Foreclosures

Defendants argued in their opening brief that the trial court abused its discretion in awarding prejudgment interest because, "except in circumstances not present here ..., [s]ection 3287(b) does not allow prejudgment interest on unliquidated obligations." Defendants raised a new argument in their reply brief, that plaintiff was not entitled to prejudgment interest under section 3287(b) because that subdivision applies only to a " 'cause of action in contract.' " We sought supplemental briefing regarding whether a lien foreclosure action is a "cause of action in contract" for purposes of section 3287(b).

Section 3287(b) provides: "Every person who is entitled under any judgment to receive damages based upon a cause of action in contract where the claim was unliquidated, may also recover interest thereon from a date prior to the entry of judgment as the court may, in its discretion, fix, but in no event earlier than the date the action was filed." By its express terms, section 3287(b) applies only when the prevailing party is entitled to damages "based upon a cause of action in contract." The issue presents a

33

question of law which we review de novo. (*Diamond*, *supra*, 217 Cal.App.4th at p. 1188.)

Whether a mechanic's lien foreclosure action is a cause of action in contract under section 3287(b) is an issue of first impression. We find instructive *George v. Double-D Foods, Inc.* (1984) 155 Cal.App.3d 36 (*George*), where the appellate court determined that quantum meruit is a cause of action in contract under section 3287(b). In *George*, the administrator of an estate sued on a quantum meruit theory to recover for the reasonable value of the decedent's services as the vice president of Double-D Foods. (*George*, at pp. 39–40.) The suit alleged that Double-D's agents had orally agreed to provide decedent bonuses and stock options in addition to his base salary, but no written employment contract was ever completed. (*Id.* at p. 40.) On appeal from a jury award of damages, Double-D Foods argued that prejudgment interest under section 3287(b) was not available in a proceeding in quantum meruit. (*Id.* at p. 46.) The appellate court disagreed, noting that "statutes relating to claims 'arising upon contract' have been applied to quasi-contractual obligations," and reasoning that "for most purposes, an action to recover the reasonable value of services is considered an action on the contract." (*Id.* at p. 47.)

Foreclosing a mechanic's lien does not technically enforce a contractual provision, but the statutory scheme is closely related to contract and quasi-contract actions. (See *Basic Modular Facilities, Inc. v. Ehsanipour* (1999) 70 Cal.App.4th 1480, 1483 ["The purpose of a mechanics' lien is to prevent unjust enrichment of a property owner at the expense of laborers or material suppliers."].) For example, the measure of damages in a lien foreclosure action is the lesser of the "price agreed upon by the claimant and the person with whom he or she contracted" (i.e., the contract price), or the "reasonable value of the labor, services, equipment or materials furnished" (i.e., the same as the measure of damages in quantum meruit). (Former § 3123, subd. (a); see *Palmer v. Gregg* (1967)

34

65 Cal.2d 657, 660 ["The measure of recovery in quantum meruit is the reasonable value of the services rendered."].)

Treating a mechanic's lien foreclosure action as a cause of action in contract is also consistent with defendants' unequivocal position in the trial court that it "simply defies common sense to even suggest" that the lien foreclosure action does not "stem from [plaintiff's] contractual rights." Defendants provide no justification for their inconsistent position on appeal. (See *Jackson v. County of Los Angeles* (1997) 60 Cal.App.4th 171, 176–177, 183–191 [plaintiff in Americans with Disabilities Act case estopped from arguing that he was a qualified individual with a disability who could perform the essential duties of police officer, after stipulating in workers' compensation case that he was unable to work in that position].) We conclude a mechanic's lien foreclosure action is sufficiently like a contract action to be considered a "cause of action in contract" for purposes of section 3287(b).

Defendants compare section 3287(b) to section 1717 (contractual attorney's fees) and note that a lien claimant not in contract with a property owner cannot recover attorney's fees under section 1717. (Citing *Abbett*, *supra*, 230 Cal.App.3d at p. 358 [" 'It is thus black letter law that except for any cause of action on a *contract* between the lien claimant and the owner of the improved property which provides for fees, a lienholder has no entitlement to them from the owner.' "].) But sections 1717 and 3287(b) are different. Section 1717 applies only "where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded" to a prevailing party. (§ 1717, subd. (a).) Section 1717 thus expressly requires a contract. Section 3287(b), by contrast, provides for the award of prejudgment interest in any "cause of action in contract" without the need to consider or interpret the terms of a particular contract.

Defendants speculate that the reason no published decision has ever affirmed an award of section 3287(b) interest in a lien foreclosure action is that those actions are not

35

causes of action in contract. But it is equally likely that the issue has simply never arisen because mechanic's liens usually involve "damages certain, or capable of being made certain by calculation" such that prejudgment interest would be available under section 3287, subdivision (a).

### 2. There Was No Abuse of Discretion in Awarding Prejudgment Interest

Defendants argue that even if the court had discretion to award prejudgment interest under section 3287(b), the court abused its discretion in doing so. We review the trial court's award for abuse of discretion. (*Esgro Central, Inc. v. General Ins. Co.* (1971) 20 Cal.App.3d 1054, 1064.)

Defendants argue prejudgment interest should not have been awarded because: the damages were uncertain and "none of the defendants could have possibly known or calculated them prior to judgment being entered"; plaintiff was the cause of the uncertainty because of its overcharging; and defendants could not tender payment because plaintiff recorded liens with willfully inflated claims. Defendants contend the "trial [court] would have been justified, under Civil Code section 3118, in invalidating [plaintiff's] liens entirely" based on willful overcharging. (See former § 3118 ["Any person who shall willfully include in his claim of lien labor, services, equipment, or materials not furnished for the property described in such claim shall thereby forfeit his lien."].)

Uncertainty is inherent in *any* award of prejudgment interest under section 3287(b) because section 3287(b) is "an exception to the general rule prohibiting prejudgment interest when the damages in issue are not capable of being made certain when due." (*Lewis C. Nelson & Sons, Inc. v. Clovis Unified School Dist.* (2001) 90 Cal.App.4th 64, 71.) As for plaintiff's overcharging, the trial court expressly found that former section 3118 did not apply because "the excess charges were inadvertent on the part of [plaintiff], not willful, and not done to inflate its lien or to defraud." The trial court further reasoned, "nothing prevented Defendants from tendering payment of what they

36

considered an undisputed sum, after commencement of the suit." Had defendants tendered an amount in good faith, that payment could have been considered by the trial court in determining whether to award prejudgment interest.

Additional factors discussed by the trial court also support the prejudgment interest award. Plaintiff's work provided obvious benefit to Monterra, even if the precise value was uncertain. Plaintiff had to wait over five years between filing its complaint and receiving a favorable judgment. Plaintiff borrowed significant amounts to keep the project going because of Monterra LLC's failure to make payments. And setting the starting date for prejudgment interest at one year after plaintiff filed its complaint (even though section 3287(b) authorizes interest from the date a complaint is filed) shows the trial court considered and balanced the equities. Defendants have not demonstrated an abuse of discretion in the trial court's prejudgment interest award.

### 3. Seven Percent is the Proper Prejudgment Interest Rate

Determining whether the 10 percent interest rate of section 3289, subdivision (b) or the seven percent interest rate from article XV, section 1 of the California Constitution applies is a question of law we review de novo. (*Diamond*, *supra*, 217 Cal.App.4th at p. 1188.)

Article XV, section 1 of the California Constitution provides that the "rate of interest upon the loan or forbearance of any money, goods, or things in action, or on accounts after demand, shall be 7 percent per annum" unless the parties "contract in writing for a rate of interest." Section 3289 provides rules for interest rates applicable to breaches of contract. If the contract specifies a legal rate of interest, a court will apply that rate "after a breach [of contract] ... until the contract is superseded by a verdict or other new obligation." (§ 3289, subd. (a).) If a contract does not stipulate a legal rate of interest, a 10 percent per annum interest rate applies in the event of a breach. (*Id.*, subd. (b).)

The parties focus on *Palomar Grading & Paving, Inc. v. Wells Fargo Bank, N.A.,* (2014) 230 Cal.App.4th 686 (*Palomar*). Palomar Grading & Paving, Inc. and Cass Construction were subcontractors that sued to foreclose mechanic's liens they recorded on commercial property after the general contractor failed to pay them for substantial portions of their work. (*Id.* at p. 688.) The lower court awarded damages for the lien foreclosure with prejudgment interest at a rate of 10 percent per annum against, among other entities, the owners of the liened property. (*Id.* at p. 689.) The appellate court agreed with the owners that the constitutional default interest rate of seven percent should apply instead of the 10 percent interest rate for breach of contract because the "salient fact here is that the owners of the property had no contract" with the subcontractors. (*Id.* at p. 690.) Although the purpose of the mechanic's lien laws is to prevent unjust enrichment of property owners, the court reasoned that the 10 percent interest rate for breach of contract does not apply in every mechanic's lien case because the benefit to the owner "is not necessarily the result of an owner's *contract* with the lien claimant." (*Ibid.*) Addressing the fairness of awarding 10 percent interest against a general contractor but only seven percent interest against a non-contracting landowner, the court explained that the differing interest rates occur because the "owner's loss is a matter of operation of law, not voluntary choice." (*Id.* at pp. 690–691.)

We find the reasoning of *Palomar* persuasive. Like the owners in *Palomar*, it is undisputed that defendants here had no direct contractual relationship with plaintiff. They were merely investors in the entity—Monterra LLC—that had a direct contractual relationship with plaintiff. While plaintiff is entitled to the reasonable value of its services from defendants as well as prejudgment interest under section 3287(b), those conclusions do not dictate that the prejudgment interest rate be 10 percent. Because defendants owe prejudgment interest by operation of the mechanic's lien laws and not because they breached a contract, the trial court erred in setting the interest rate at 10 percent rather than seven percent.

38

Plaintiff notes that defendants succeeded to Monterra LLC's interest, and contend that as successor owners they remain subject to plaintiff's liens and all its "incumbent rights." But being subject to plaintiff's liens does not mean defendants should pay the same prejudgment interest rate on those liens as Monterra LLC must pay by virtue of breaching its contract with plaintiff. Monterra LLC owes interest at the breach of contract default rate of 10 percent (§ 3289, subd. (b)) because it voluntarily agreed to enter into a contract with plaintiff. Defendants, on the other hand, are responsible for the liens and associated prejudgment interest by operation of law because they invested in Monterra LLC without taking steps to ensure that their deeds of trust would take priority over any mechanic's liens. (See *Palomar*, *supra*, 230 Cal.App.4th at p. 691 [it is equitable to charge non-contracting owners seven percent instead of 10 percent because "the owner's loss is a matter of operation of law, not voluntary choice"].)

We acknowledge what may appear to be an inconsistency in determining that a mechanic's lien foreclosure is an action in contract under section 3287(b), but that the 10 percent interest rate for breach of contract judgments under section 3289, subdivision (b) does not apply. But looking at the text of the statutes at issue, section 3287(b) applies broadly to any cause of action in contract, whereas section 3289 applies only to *breach* of contract actions. Like section 1717, section 3289 provides tools to aid contract interpretation and thus assumes a contract between the parties. As there was no contract between plaintiff and defendants, there could be no breach, and section 3289 therefore does not apply.

## F. REMAND INSTRUCTIONS

We provide the following guidance for the trial court's benefit in a limited trial on remand.

The trial court's first task involves both liens. The court must recalculate the amount of the Site Improvement Lien and Water Lien after subtracting sums associated with any contractual interest included in the liens as a result of Monterra LLC's

39

agreement to pay plaintiff contractual interest. To the extent the parties are unable to stipulate to a new calculation based on the existing record, additional expert testimony may be necessary. Once the new lien totals are determined, the trial court must divide the amount of the Site Improvement Lien among the lots in phases seven and nine.

The trial court's second task involves only the Water Lien. The court must determine the precise number of lots that benefited from the Water Lien. We can state with certainty based on the record before us that at minimum all lots within Monterra benefited from the Water Lien improvements. The parties dispute whether the Water Lien also includes balances due for improvements benefiting lots *outside* Monterra (i.e., lots owned by Tehama in either Tehama or Cañada Woods North). The parties appear to agree that certain water infrastructure *improvements* benefited lots owned by Tehama, but disagree regarding whether the Water Lien itself contains amounts associated with lots outside Monterra. (Defendants argue the Water Lien includes charges for improvements benefiting Tehama, whereas Williams testified that Tehama was billed separately for water infrastructure.) Upon resolving that factual dispute and determining the total number of benefited lots, the court must divide the new Water Lien total by the number of benefited lots. Each of the 58 lots listed in the original judgment in this case will then be responsible for that lot's pro rata share of the Water Lien. (Plaintiff acknowledges its recovery is limited to those 58 lots, noting in its cross-appeal that it is "not arguing that it should be permitted now to recover from the sold lots their proportionate share of the water lien, only that in making the calculations on a remand, the water lien would first have to be allocated across the 171 lots to determine each benefitted lot's proportionate share (i.e., 1/171th) of the water lien.")

Prejudgment interest at a rate of seven percent must then be added to the newly calculated amounts for both liens, with a starting date of June 26, 2009 (the date already selected by the trial court). (Cal. Const., art. XV, § 1.)

40

## III.    DISPOSITION

The judgment is reversed and the matter is remanded for a limited retrial (as described in Part II.F. of this opinion) to remove contractual interest from both the Site Improvement Lien and the Water Lien, reapportion the Water Lien, and recalculate prejudgment interest.  Each party shall bear its own costs on appeal.

_____

Grover, J.

**WE CONCUR:**

_____

Premo, Acting P. J.

_____

Bamattre-Manoukian, J.

**H041005 -** *Carmel Development Company, Inc. v. Anderson et al.*

| | |
|---|---|
| Trial Court: | Monterey County Superior Court<br>Superior Court No. M91649 |
| Trial Judge: | Hon. Thomas W. Wills |
| Counsel for Plaintiff/Appellant:<br>Carmel Development Company, Inc. | Joel Franklin<br>  Law Offices of Joel Franklin<br>Anne Frassetto Olsen<br>  Law Offices of Anne Frassetto Olsen<br>Robert P. Herendeen<br>  Herendeen & Bryan |
| Counsel for Defendants/Appellants:<br>Larry Anderson, et al. | Christopher Ross Rodriguez<br>  Lewis Brisbois Bisgaard & Smith LLP |
| Counsel for Defendant/Appellant:<br>Monterey County Bank | Robert E. Rosenthal<br>  L&G, LLP |

**H041005 -** *Carmel Development Company, Inc. v. Anderson et al.*